UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JASON JERICHO COOK, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:14-CV-1695-CEJ ) |
| GEORGE LOMBARDI, et al., | ) ) |
| Defendants. | ) |

### MEMORANDUM AND ORDER

This matter is before the Court on the motion of defendants Timothy Bertelsmeyer, Clive Hedrick, and Donald Walcott for partial summary judgment, pursuant to Fed. R. Civ. P. 56(a).[1] Plaintiff responded, and the issues are fully briefed.

**I. Background**

**A. Claims**

Plaintiff Jason Jericho Cook, an inmate at the Potosi Correctional Center (PCC) in Potosi, Missouri, initiated this 42 U.S.C. § 1983 action on October 2, 2014. The Court dismissed claims against nine individual defendants and several official capacity claims on October 24, 2014. On June 1, 2015, the Court granted summary judgment to three other defendants because, *inter alia*, plaintiff failed to exhaust his available administrative remedies. Plaintiff has five remaining claims[2]:

---

[1] Defendants' motion for summary judgment does not address all of the plaintiff's claims. Consequently, the instant motion is construed as for partial summary judgment.

[2] The Court gives plaintiff's "pro se complaint" the benefit of a "liberal construction" because, "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Rey v. United States*, 786 F.3d 1089, 1091 (8th Cir. 2015). The Memorandum and Order of October 24, 2014, explicitly left intact all individual claims against

(1) Plaintiff first claims three corrections officers—Timothy Bertelsmeyer, Clive Hedrick, and Donald Walcott—used excessive force on him on February 7, 2014, in contravention of the Eighth Amendment. All three defendants move for summary judgment on those claims. Video footage submitted as an exhibit to the instant motion captures the incident.[3] As the video shows, the officers applied force to plaintiff, which leaves only the question whether the amount of force applied was unconstitutionally excessive in the circumstances. Further, plaintiff testified that, as to the excessive force claims: "I don't think Walcott or Hed[rick] did anything wrong." Pltf. Dep. at 51:17–18.

(2) Additionally, plaintiff claims Bertelsmeyer is liable for "verbal harassment" for repeatedly "calling" plaintiff "names" before and during the use of force, which included referring to plaintiff as a "bitch" and, at least once, a "Cho-mo," a derogatory reference to the crime of which he was convicted. Compl. ¶¶ 20, 66; Pltf. Dep. at 11:16–18, 29:7–8, 55:14–19. Bertelsmeyer did not address whether that purported guard-on-inmate "harassment" claim is actionable.

(3) Plaintiff relatedly alleges Bertelsmeyer "deliberately" announced plaintiff's "status as a sexual offender," *i.e.*, a "Cho-mo," "in the presence of other offenders" "with the intent to cause" other prisoners "to retaliate against" plaintiff,

---

Bertelsmeyer, Hedrick, and Walcott. Five separate claims against those defendants in their individual capacities are discernible in the complaint.

[3]In response to the instant motion plaintiff says the video, "could not and did not reflect what really happened," and that the "footage was misconstrued." [Doc. #69 at 3] He makes only a conclusory allegation that the video evidence is not to be believed because of the "camera angle" and "definition." *Id.* But the video is clear as to all of the relevant details, and plaintiff has provided no evidence from which a reasonable juror could infer the video was doctored. Therefore, the Court adopts the version of the facts evidenced in the uncontroverted video because, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010). Further, the Court does not consider four inmates' affidavits submitted with the complaint, because they are squarely contradicted by the video record.

2

"subject[ing] him to violent confrontations" and putting his "life in danger." Compl. ¶¶ 66, 73–74. That announcement purportedly created "an unreasonable risk of causing" plaintiff "physical and mental injury" and caused him "emotional distress." *Id.* ¶¶ 75–76; *see id.* ¶ 82. It was not alleged in the complaint, nor has any evidence been submitted, that plaintiff has been assaulted by other inmates following Bertelsmeyer's remark. Nor has evidence been adduced that Bertelsmeyer made such a statement more than once, and that single alleged instance occurred when the video shows no other inmates were present. Bertelsmeyer did not move for summary judgment on that prospective failure-to-protect (*i.e.*, exposure to risk of future injury) claim.

(4) Plaintiff next claims Bertelsmeyer made a single threat on plaintiff's life during the use of force, stating: "I'll fuckin kill you." Pltf. Dep. at 13:23–24, 47:3; *see* Compl. ¶ 28; *see also* [Doc. #1-1 at 6]. The video record is silent, and so does not contradict that allegation. Bertelsmeyer did not request summary judgment on the alleged "death threat" claim.

(5) As to Hedrick and Walcott, plaintiff contends they failed to "stop" and "report" Bertelsmeyer's excessive use of force, a failure-to-intervene claim. Pltf. Dep. at 51:20–52:14. Plaintiff acknowledges, however, that a non-defendant sergeant—*i.e.*, the person Hedrick and Walcott would have reported the incident to—was "watching everything" from a monitoring "bubble" nearby, observing the "whole incident." *Id.* at 12:1–3, 14:4–5. Though neither guard addressed that claim when moving for summary judgment, the failure-to-intervene claim is inexorably intertwined with the excessive use of force claim against Bertelsmeyer.

Relevant to those claims, plaintiff seeks damages, an injunction preventing

3

the officers from using excessive force on him in the future, and an injunction forbidding Bertelsmeyer from again harassing or coming into contact with plaintiff.

**B. Facts**

On February 7, 2014, Bertelsmeyer, Hedrick, and Walcott were escorting plaintiff to his cell in the PCC's "B" wing. Plaintiff's arms were handcuffed behind him. Bertelsmeyer was walking behind plaintiff, while Hedrick and Walcott were flanking him, holding his arms. Bertelsmeyer was speaking to plaintiff. Plaintiff alleges Bertelsmeyer repeatedly called him a "bitch" on February 7, and at least once referred to him as a "Cho-mo," in reference to his "status as a sexual offender." Compl. ¶¶ 20, 66; Pltf. Dep. at 11:16–18, 29:7–8, 55:14–19.

Plaintiff "was trying to turn around and look at" Bertelsmeyer, but Hedrick and Walcott continued to "push[]" plaintiff forward. Pltf. Dep. at 32:15–22. Attempting to "look at" Bertelsmeyer while "talking to him," and because Hedrick and Walcott "wouldn't let" him, plaintiff "planted" his "feet and turned around real[ly] quick[ly]." *Id.* at 32:22–25. The video confirms plaintiff planted his feet in front of him, bracing himself against Hedrick and Walcott's attempt to move him forward. Plaintiff then started walking forward again, but he took a sudden step to the right, jerking away from Hedrick and Walcott. Plaintiff turned around and to his right, making an about face, while Hedrick and Walcott further attempted to restrain plaintiff's movement. After regaining control, the officers began walking plaintiff back toward the main entryway to the "B" wing.

As the officers did so, however, plaintiff again planted both feet in front of him at an angle, resisting the officers' forward movement. He then juked to his side, attempting to unpin his arms and wrest himself from Walcott and Hedrick. His

4

attempt to evade the officers caused him and Hedrick to lose balance, and both men fell to the ground. Walcott immediately followed them down.

Hedrick and Walcott flipped plaintiff onto his stomach and restrained his arms, head, and back. Bertelsmeyer then dropped to the ground and restrained plaintiff's legs. Plaintiff claims Bertelsmeyer was "pushing" his legs "upwards, with [plaintiff's] knees bent, twisting [his] foot, like it was a top." *Id.* at 33:15–17. He alleges Bertelsmeyer was "trying to break" his foot. *Id.* at 33:17–18. During that use of force plaintiff was all the while resisting the officers' efforts to restrain him.

Approximately thirty seconds later, Bertelsmeyer released plaintiff's legs and stood up. Walcott and Hedrick continued to hold plaintiff's arms while releasing their grips on his head. They rose at plaintiff's sides, pulling him to a standing position. Bertelsmeyer stood a few feet behind the group. Plaintiff, flanked and arms restrained by Hedrick and Walcott, and trailed by Bertelsmeyer, was then escorted out of the "B" wing and into the "sally port," a hallway outside the entry to the wing. As to Bertelsmeyer's use of force while restraining plaintiff's legs and feet, plaintiff admitted at deposition: "That use of force, I would not say was excessive." *Id.* at 33:5–34:4.

Once the quartet arrived in the hallway, Bertelsmeyer handcuffed plaintiff to a restraint bench, attaching his existing handcuffs to a set of cuffs welded to the bench. When he did so, Bertelsmeyer "started tightening the cuffs" on plaintiff's "wrists," which allegedly has left "a scar." *Id.* at 37:17–19. The officers finished securing plaintiff's arms and they walked away, returning a few minutes later.

Moments after they returned, plaintiff admits he "turned around and spit on" Bertelsmeyer's face. *Id.* at 42:2. The video shows plaintiff spitting on

5

Bertelsmeyer from inches away. According to plaintiff, the officers could have "grabbed [his] face and restrained it," and they would have been justified in doing so because he had "just spit, so that's a threat and [the officers] ha[d] to restrain" him. *Id.* at 42:3–8. Further, plaintiff surmised, "after [he] spit, that's all [the officers] had to do," the "minimum amount of force required" would have been "to grab [plaintiff's] face and restrain" him "again." *Id.* Notably, however, the video shows Walcott was at plaintiff's feet attempting to secure him in leg restraints at that time, in the path of where plaintiff would have preferred to be restrained.

Plaintiff testified Bertelsmeyer then "hit" plaintiff with his "fist or an open hand" on the "front left side of [his] forehead" and "forced" plaintiff "over" the restraint bench. *Id.* at 43:15–44:9. To the contrary, the video evidence shows that as soon as plaintiff spit on Bertelsmeyer, both Hedrick and Bertelsmeyer reached over plaintiff's left shoulder and neck to pull his head, neck, and torso down and forward, keeling him away from Bertelsmeyer but in the direction of Walcott. Bertelsmeyer is not seen on the video hitting plaintiff's forehead. In fact, Hedrick's arm, not Bertelsmeyer's, was pressed against plaintiff's neck, and Bertelsmeyer was restraining plaintiff's chest and shoulder with one hand and his back with the other.

Two seconds later, both officers pulled plaintiff to the right and off the restraint bench, away from Walcott, attempting to restrain his head and neck as they did so. Plaintiff fell to the ground, landing on his right shoulder, right torso, and head, with his arms extended behind him, still handcuffed to the restraint bench. Hedrick and Bertelsmeyer quickly maneuvered plaintiff onto his stomach.

Over the course of the next fifty-five seconds, the video shows plaintiff first

6

shook his legs and resisted, even while still handcuffed to the restraint bench and after having been taken to the ground. He then further resisted as Hedrick and Bertelsmeyer attempted to restrain his back, head, and neck. At that point Walcott also got down on the ground and attempted to restrain and cuff plaintiff's legs, while plaintiff continued to thrash about. With all three officers on top of him, and with his arms, back, head, and legs partially restrained, the video shows plaintiff's head and legs jerking back and forth as he continued to resist.

Plaintiff testified that while he was on the ground, Bertelsmeyer once uttered some variation of: "I'll fuckin kill you." *Id.* at 13:23–24, 47:3; *see* Compl. ¶ 28. Plaintiff does not allege that remark placed him in justified fear of imminent death, merely that it "is possible" Bertelsmeyer could carry out the threat, [Doc. #1-1 at 6], and that the remark was "malicious and deliberate." Compl. ¶ 28. Bertelsmeyer was also "applying pressure" to his neck, and plaintiff meanwhile "was trying to make sure that [his] forehead was on the floor," to avoid breaking his nose. Pltf. Dep. at 46:13–18. According to plaintiff, Bertelsmeyer then released "the pressure on the back" of plaintiff's "head," at which point plaintiff "lifted up" his head, and Bertelsmeyer then "smashed [his] face off the floor" several times. *Id.* at 13:24–14:3.

The video instead shows that while plaintiff continued to move about as the three officers were on top of him, Bertelsmeyer attempted to secure plaintiff's head and neck in one place with both hands. Plaintiff continued to struggle, however, and Bertelsmeyer shifted positions multiple times as he attempted to counter plaintiff's movements. Though for approximately ten seconds over the course of the entire altercation plaintiff's head is obscured by Bertelsmeyer's body, it

7

otherwise is visible in continuous contact with the floor. At no point does the video show plaintiff lifting his head any discernable distance from the floor or Bertelsmeyer "smashing" plaintiff's face back down once, let alone multiple times. Further, during the few seconds when plaintiff's head is not clearly visible, the video shows Bertelsmeyer was on top of plaintiff and applying downward pressure to hold his head and neck in place, vitiating plaintiff's allegation that Bertelsmeyer repeatedly released his hold on plaintiff to facilitate "smashing" his face back down.

The altercation ended just over one minute after it began when a sergeant emerged from the "bubble" and said that he would Mace plaintiff if he made any "false moves." *Id.* at 49:24–50:8. Plaintiff was then placed back on the restraint bench, his cuffs were loosened, and he was instructed "not to make any sudden moves." *Id.* at 50:18–51:2. He was subsequently charged with assaulting a corrections officer, creating a disturbance, and disobeying an order. [Doc. #63-8] Plaintiff claims that, though Bertelsmeyer was admittedly justified in using some force on him after he spit, Bertelsmeyer used more than "the minimum amount of force required to restrain" him. Pltf. Dep. at 12:20–23.

According to plaintiff, the officers' use of force left his face bleeding, his lip "busted open" and "split," his wrist bleeding, and his "shoulder hurt[ing]." *Id.* at 14:21–15:10, 16:19–22, 18:10–11. With the exception of plaintiff's shoulder, it is undisputed those injuries healed following the administration of routine pain medication. Plaintiff also complained that his teeth were "chipped" or "a little bit loose," but he told a nurse tending to his injuries that it was "not a big deal." *Id.* at 16:19–17:2. A dentist later repaired plaintiff's tooth. *Id.* at 23:20–23. On February 20, 2014, plaintiff also told a nurse that during the incident he "got a

8

crack in [his] forehead," but the nurse reported she was "unable to feel a crack in his forehead." [Doc. #63-7 at 10]  Plaintiff did not complain of pain on palpation of his head, dizziness, blurred vision, nausea, or vomiting.  *Id.*  He does not allege an ongoing forehead injury.

A shoulder x-ray on February 14, 2014, revealed plaintiff's right shoulder had a "glenohumeral subluxation/dislocation."  [Doc. #63-7 at 6]  He was also examined by a physician on February 24, who "advised" plaintiff "of [the] probable chronic nature" of the subluxation and who told plaintiff that it "may minimize" with range of motion exercises. *Id.* at 11.  Further evaluation, restrictions, and physical therapy was "not medically indicated."  *Id.*  Plaintiff was, however, seen by a physical therapist on April 9, 2014.  The therapist prescribed daily range of motion exercises for the chronic shoulder condition.  Plaintiff continues those exercises.

### II. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Once the moving party has met its burden, the non-

moving party may not rest on the allegations of his pleadings but "must set forth specific facts," by affidavit or other evidence, showing that a genuine issue of material fact exists. *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

#### A. Excessive Force

##### 1. Hedrick and Walcott

Plaintiff testified that he does not believe Hedrick or Walcott used excessive force on him during the incidents in question. *See Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013) (explaining the excessive force inquiry). Therefore, no genuine dispute of material fact exists that Hedrick and Walcott are entitled to summary judgment on plaintiff's excessive use of force claims.

##### 2. Bertelsmeyer

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Burns v. Eaton*, 752 F.3d 1136, 1138 (8th Cir. 2014) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "When confronted with a claim of excessive force alleging a violation of the Eighth Amendment, the core judicial inquiry is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Santiago*, 707 F.3d at 990 (quoting

10

*Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992)).

> Factors to be considered in deciding whether a particular use of force was reasonable are whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury.

*Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (citing *Hudson*, 503 U.S. at 7). "'[T]he extent of any resulting injury, while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim.'" *Santiago*, 707 F.3d at 990 (quoting *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010)).[4]

Where an "inmate ha[s] created a prison disturbance requiring some use of force," a court must determine, "whether the inmate's testimony, viewed in light of other relevant factors such as the extent of [his] injury and the security threat reasonably perceived by [the] defendants, [would] support a reliable inference of an unnecessary and wanton infliction of pain." *Id.* (quotation marks and citation omitted). If no such reliable inference can be drawn, summary judgment is appropriate. *See id.* In weighing those factors, however, a court is required to "avoid[] the improper resolution of credibility issues," which are assessments for the trier of fact and not for summary judgment. *Id.* (quotation marks and citation omitted).

As to Bertelsmeyer's use of force when restraining plaintiff's legs in the "B"

---

[4]Consequently, the Court does not address Bertelsmeyer's argument that he is entitled to summary judgment because Cook's injuries were *de minimis*. *See Chambers v. Pennycook*, 641 F.3d 898, 906–07 (8th Cir. 2011) ("[T]here is no uniform requirement that a plaintiff show more than a *de minimis* injury to establish an application of excessive force." (citations omitted)). Consistent with *Chambers*, the Court's discussion regarding the severity of Cook's injuries is directed to determining whether the force Bertelsmeyer used was excessive.

wing during the initial altercation, plaintiff testified: "That use of force, I would not say was excessive." Pltf. Dep. at 33:5–34:4. Consequently, no genuine dispute of material fact precludes summary judgment on that excessive force claim.

Further, during the confrontation in the "B" wing, the video shows plaintiff strenuously resisted all three officers' attempts to subdue him and restore discipline, in spite of plaintiff being handcuffed. Within five minutes of that altercation Bertelsmeyer tightened plaintiff's handcuffs, allegedly causing injuries to his wrists that healed on their own, leaving only a purported scar. Tightening the handcuffs was objectively justified in the circumstances given the threat that plaintiff might again attempt to wrest himself free of the officers' control, as he later did. Plaintiff's injuries from that application of force were also so minor as to require no ongoing medical attention, which belies any suggestion that Bertelsmeyer tightened the cuffs in excess of what was justified in the circumstances. No reliable inference can be drawn that Bertelsmeyer's tightening the handcuffs resulted in an unnecessary and wanton infliction of pain because plaintiff was not restrained sufficiently by the cuffs when they were looser in the "B" wing. No reasonable juror could find that tightening the handcuffs was malicious and sadistic, rather than a justified, good-faith attempt to restore discipline and order in the minutes after the altercation in the "B" wing. Therefore, no genuine dispute of material fact precludes summary judgment on that excessive force claim.

Next, contrary to plaintiff's contention that Bertelsmeyer need only have grabbed his face in response to the spitting attack, plaintiff's continued noncompliance justified quickly taking him to the ground. As the video shows, Bertelsmeyer and Hedrick first attempted to secure plaintiff in a forward position

12

away from Bertelsmeyer, the victim, but doing so put Walcott closer to the risk of harm. Within two seconds, Bertelsmeyer and Hedrick moved plaintiff to the ground in an attempt to gain control, which placed Walcott out of harm's way.

The officers' decision to take plaintiff to the ground after his attack may have caused some of his superficial facial injuries when he landed, injuries that healed on their own. The officers' efforts to restore discipline after plaintiff's second act of recalcitrance in ten minutes also resulted in his arms being hyperextended behind him while still handcuffed to the bench, causing the now-chronic shoulder injury. Though plaintiff's shoulder injury is unfortunately ongoing, the video shows it was the result of an objective need to use force to restore order and to prevent additional injury to the officers in a tense situation requiring near-instantaneous decision-making. No reasonable juror faced with the video evidence could conclude that the split-second decision to take plaintiff to the ground in a manner that incidentally injured him was a malicious or sadistic attempt to wantonly inflict pain upon him. Accordingly, Bertelsmeyer is also entitled to summary judgment on that excessive use of force claim.

Finally, the video leaves no doubt Bertelsmeyer's efforts to restrain plaintiff's head and neck on the ground over the course of fifty-five seconds were not excessive given the need to restore discipline. Plaintiff was resisting the entire time he was on the ground until the sergeant arrived with Mace, and even with all three officers holding him. Further, the first use of force in the "B" wing, then tightening plaintiff's handcuffs, and then securing him to the bench were all unsuccessful at preventing his attack. No reasonable juror could find Bertelsmeyer's efforts to restrain plaintiff's head and neck were malicious or sadistic given the obvious risk

plaintiff would again attack the officers.

Though plaintiff's facial injuries were likely caused when he was in contact with the floor, those injuries largely healed without medical intervention, save plaintiff's tooth, which was repaired. No evidence has been adduced that those injuries are anything other than the result of Bertelsmeyer's attempt to hold plaintiff in place while he continued to thrash about. Nor does the video show plaintiff being punched or repeatedly lifting his head off the ground, only to have Bertelsmeyer "smash" it back down, contrary to plaintiff's contention. No reasonable inference can be drawn that Bertelsmeyer's efforts to hold plaintiff's head and neck resulted in an unnecessary and wanton infliction of pain exceeding the good-faith effort to restore discipline given such minimal injuries. Bertelsmeyer is therefore entitled to summary judgment on this excessive use of force claim.

**B. Failure to Intervene**

The Eighth Amendment imposes a duty on prison officials to "take reasonable measures to guarantee safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The application of that duty in the excessive use of force context can be divided along two temporal lines of analysis, before and after the use of force. As relevant here, after a guard begins to use excessive force on a prisoner, the officer "who knows another officer is using excessive force has a duty to intervene." *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012) (citing *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)). To prove that an officer failed to intervene to protect a prisoner from excessive use of force by a guard, the prisoner must show that the guard used excessive force, that the officer knew about the excessive use of force, and that the officer had the opportunity to intervene to prevent the

14

excessive force by his compatriot but failed to do so. *Putnam*, 639 F.2d at 423.

Plaintiff has failed to show a genuine dispute of material fact exists regarding an essential element of his failure-to-intervene claims against Hedrick and Walcott. Because no reasonable juror could determine that Bertelsmeyer's use of force was unconstitutionally excessive in the circumstances, it follows that Hedrick and Walcott cannot be liable for failure to intervene during that use of force. Therefore, Hedrick and Walcott are entitled to summary judgment on plaintiff's failure to intervene claims. Further, because those are the only remaining claims against Hedrick and Walcott, summary judgment will be entered in their favor at the close of all proceedings in this matter.

### C. Remaining Claims

Plaintiff has three remaining claims, all of which are asserted against Bertelsmeyer: (1) officer-on-inmate verbal harassment claim; (2) failure-to-protect claim based on an officer-created risk of harm by other inmates; and (3) death-threat claim. These claims will be addressed at trial.

Previously, the Court denied plaintiff's motion for appointment of counsel without prejudice. Because it now appears that the plaintiff would benefit from legal assistance in preparing for and conducting the trial, counsel will be appointed to represent him. *See, Trotter v. Lawson*, ___ F. App'x ___, No. 15-2014, 2016 WL 105667, at *2 (8th Cir. Jan. 11, 2016)(court "should seriously consider appointing counsel when an indigent plaintiff states a colorable claim and the nature of the case is such that he and the court would benefit from assistance of counsel," even though appointment of counsel "may have been unwarranted early in the proceedings . . .")(quotation marks and citations omitted).

* * *

**IT IS HEREBY ORDERED** that the motion of defendants Timothy Bertelsmeyer, Clive Hedrick, and Donald Walcott for partial summary judgment [Doc. #62] is **granted**.

Judgment will be entered in favor of defendants Clive Hedrick and Donald Walcott at the conclusion of this case.

**IT IS FURTHER ORDERED** that the Clerk of Court shall appoint counsel for plaintiff pursuant to the Plan for the Appointment of Pro Bono Counsel. A separate Notice of Appointment of Pro Bono Counsel shall be entered by the Clerk.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of May, 2016.